UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
COMMERCIAL UNION INSURANCE
COMPANY,                                      :

               Petitioner,        :        02 Civ. 0573 (TPG)

        - against -                   :        **OPINION**

DAVID E.W. LINES, et al.,                     :

            Respondents.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - x
ONEBEACON AMERICA INSURANCE
COMPANY, formerly known as                    :
Commercial Union Insurance Company,

                     :        03 Civ. 7376 (TPG)

            Petitioner,        :

        - against -                   :

DAVID E.W. LINES, et al.,                     :

            Respondents.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/30/08

This matter is before the court on remand from the Second Circuit,

which reviewed a previous District Court decision by Judge Berman in the first

of the captioned cases, 02 Civ. 0573. The opinions of Judge Berman and the

Circuit are, respectively, 239 F. Supp. 2d 351 (2002), and 378 F.3d 204 (2004).

The litigation involves arbitration proceedings between an insurance

company named Electric Mutual Liability Insurance Company ("EMLICO") and

one of its reinsurers, formerly known as Commercial Union. EMLICO was a

Massachusetts insurance company. Its major insurance client was General
Electric Company. In 1995, EMLICO moved its general liability insurance
business with General Electric from Massachusetts, so that this business
would be domiciled in Bermuda. This has been referred to as the
"redomestication." It is the redomestication which gave rise to the 02 Civ. 0573
case in the District Court and the Court of Appeals. Regarding the remand, the
Court of Appeals stated:

> In conducting its review, the district court may, as it finds
> appropriate after further proceedings, adopt or modify the now-
> vacated order currently before us on appeal. 378 F.3d. at 209.

Following the remand, discovery was held and there has been an eleven-
day evidentiary hearing. Based on this hearing, the District Court now adopts
Judge Berman's order in full. The precise nature of that order and of the
directions of the Court of Appeals for the remand will be described hereafter.

While the appeal from Judge Berman's order was pending, the second of
the captioned actions was commenced, 03 Civ. 7376, which raises issues
closely related to 02 Civ. 0573. The parties have indicated that they fully
expect that the hearing held on remand in 02 Civ. 0573, and the present
opinion following that hearing, will dispose of 03 Civ. 7376. Accordingly, the
court rules that the petition in 03 Civ. 7376 is dismissed.

## Facts

The redomestication occurred after General Electric began making

insurance claims against EMLICO in larger and larger volumes, related to asbestos injuries and to environmental cleanup costs. Prior to this time, General Electric's asbestos claims and environmental cleanup claims against EMLICO had been relatively few in number and had been handled in such a way that General Electric had basically ended up recovering little or no insurance from EMLICO. On the asbestos side, this resulted from the fact that EMLICO was treating asbestos claims essentially the same as it was treating workmen's compensation claims. Each claim was treated as a separate "occurrence" under the applicable liability policies. The applicable policies were comprehensive general liability (CGL) policies. There was also a method of allocation as to the time of injury, which favored EMLICO. As to the environmental cleanup claims, the record shows that for 20 years or more EMLICO had taken the position that these claims were not covered by the CGL policies, and General Electric had not challenged this. This later led to what has been called the "shared understanding" defense to General Electric's environmental cleanup claims.

It was in about 1984, as a result of new federal legislation, when General Electric realized that it would have greatly increased liability for environmental cleanup costs. And it was in about 1991 when General Electric began experiencing greatly increased asbestos injury claims. In connection with both these subjects, General Electric sought to have EMLICO change its past

positions and practices so that General Electric could start recovering insurance.

As to the environmental issues, EMLICO still took the position that its policies did not provide coverage. This led to a non-binding arbitration between General Electric and EMLICO, which lasted from 1988 until 1991. The arbitration was terminated for some reason before it was completed, but in 1991 the arbitrators issued a tentative opinion disagreeing with EMLICO's position. In the years 1992 to 1994, EMLICO settled six environmental claims with General Electric, noting that this was without prejudice to its legal defenses. At this point, EMLICO was compelled to look to its reinsurers if it was to keep settling these claims. However, the reinsurers basically took the position that EMLICO should not be settling, and declined to contribute reinsurance. EMLICO then stopped settling environmental claims with General Electric.

As to asbestos claims, General Electric and EMLICO agreed in 1992 to what is known as the Asbestos Claims Handling Agreement ("ACHA"). This grouped together asbestos claims that related to General Electric product types. EMLICO started settling asbestos claims with General Electric on the basis of this agreement, and apparently EMLICO had reasonable success in recovering from the reinsurers. However, in 1993 Commercial Union refused to pay on asbestos claims and demanded arbitration. This set in motion a

process of arbitration between EMLICO and Commercial Union.

Returning to the environmental claims, a severe problem existed regarding reinsurance. General Electric's insurance claims were potentially huge, running into the billions of dollars. There was no possibility that EMLICO could handle them on its own. Naturally, both EMLICO and General Electric looked to see what could be done about the reinsurers, particularly regarding the environmental claims.

Although EMLICO had not yet increased its reserves to cover the increased liabilities and potential liabilities which were looming up, it was apparent that EMLICO was in very serious financial difficulty, mainly because of the failure to reach an understanding with its insurers – the reinsurers – on the environmental claims. Both EMLICO and General Electric, and their numerous lawyers, began considering the possibility of moving the relevant part of EMLICO's business out of Massachusetts. There are now in the record memoranda and letters (which were undoubtedly thought at the time to be subject to attorney-client privilege), which discuss various ways in which redomestication could help General Electric recover more from reinsurers. There were certain agreements and certain disagreements about what should be done. Certain concepts in these documents were sharply criticized by some lawyers and were dropped. However, EMLICO ultimately decided to redomesticate its general liability business with General Electric to Bermuda.

This redomestication occurred on July 1, 1995.

Shortly thereafter EMLICO took the position that it was insolvent and, on October 20, 1995, filed a winding-up petition in Bermuda.

It had been understood that, under Bermuda law, Joint Liquidators would step into the shoes of EMLICO after the winding-up petition. Representatives of EMLICO and General Electric had indeed visited Bermuda in early 1995 and had carried on extensive discussions with at least one of the possible Joint Liquidators, Peter Mitchell. He explained in detail what would happen in a Bermuda liquidation.

Jumping ahead to one of the arbitration awards made in the arbitration between EMLICO and Commercial Union (the so-called Phase I award of October 31, 2001), the arbitration Panel stated, among other things, that "EMLICO deceived the Massachusetts Commissioner of Insurance and Bermuda authorities about its insolvency" in connection with the redomestication. What is referred to is as follows. EMLICO needed to have the permission of both the Massachusetts Insurance Commissioner and the Bermuda authorities to carry out the redomestication. It appears that neither Massachusetts nor Bermuda would have permitted the redomestication if it had appeared that EMLICO was insolvent. Although it was apparent that EMLICO was then in financial difficulty and faced greater financial difficulty in the near future, EMLICO did not admit actual insolvency to the authorities.

And yet, almost immediately after the redomestication, EMLICO filed a winding-up petition in Bermuda. This is the circumstance which obviously led the arbitration Panel to find deceit.

It should be stated at this point that the deceit, although a serious matter, did not have unlimited effects. This was not a redomestication into a lawless or corrupt country or into a place where one could simply succeed by paying bribes. Bermuda was the direct opposite. Indeed, the evidence indicates that Bermuda is a place where liquidations can be carried out with great efficiency and with strict adherence to law. The record developed in the recent District Court hearing has established beyond question that the three Joint Liquidators were persons of the highest character with great experience germane to the task before them. They were not persons who could be used as tools by General Electric, nor did their conduct of the proceedings show even the slightest tendency toward such a thing.

There were objections by some reinsurers to the redomestication after it was carried out, but none of this succeeded in nullifying the redomestication. The Joint Liquidators took it as their obligation to deal with insurance claims of General Electric against EMLICO, and claims of EMLICO against reinsurers. By the time of the redomestication, EMLICO had paid more than $138 million to General Electric for asbestos claims. As to environmental claims, EMLICO had settled with General Electric with respect to its cleanup costs at six sites.

But by far the most serious matter to be dealt with related to the mass of additional environmental claims. About 500 General Electric manufacturing sites were involved, and the potential liability was apparently about $4 billion.

In order to try and avoid extremely protracted and costly litigation, the Joint Liquidators devoted a great deal of effort toward settlement. This included, most importantly, settlement with reinsurers. In making this attempt, the Joint Liquidators were only exercising ordinary prudence. They selected a well-qualified Washington D.C. lawyer, Margaret Warner, who proceeded to amass information about the various sites, and to provide a forum where the interested parties could lay out their positions regarding insurance coverage, including all possible defenses available to EMLICO and to the reinsurers. This process proved to be enormously beneficial. The information Warner gathered was passed on to reinsurers, who appointed counsel and experts. The result was that all reinsurers entered into settlements except for Commercial Union and two small reinsurers. The settlements involved hundreds of millions of dollars, and were without question a remarkable achievement on the part of the Joint Liquidators and Warner.

Commercial Union participated to some extent in the Warner process, but it had another strategy in mind. Commercial Union sought to benefit from the redomestication in a very large way. Commercial Union sought to use its objections to the redomestication as a basis for having its reinsurance

contracts with EMLICO rescinded.

Commercial Union pursued its claim for rescission in the arbitration which had been commenced in 1993. At some point, Commercial Union obtained what have been called the "redomestication documents." These were largely the memoranda and communications of counsel that were referred to earlier. An attorney-client privilege was asserted for a time, but Commercial Union ultimately obtained the documents. In the view of Commercial Union, the redomestication documents greatly strengthened its claim for rescission, by showing a plan to have General Electric control a liquidation in Bermuda.

On another front, apparently the stance of Commercial Union on the environmental claims led the Joint Liquidators to believe that Commercial Union would not likely settle these claims. Consequently, in 1999 and 2000, the Joint Liquidators made a first offer, then a second offer, and then a third offer to have Commercial Union take over EMLICO's position on the environmental claims for the purpose of litigation which Commercial Union might wish to pursue. Each time, Commercial Union refused. The reasons for these refusals need not be discussed here. Commercial Union was not obligated to accept these offers and did not do so.

Commercial Union sought in the arbitration a ruling that it had the right to "interpose defenses." This means the right to assert defenses to General Electric's claims on behalf of EMLICO. The evidence indicates that the Joint

Liquidators were agreeable to this, even as to reinsurance contracts which contained no such provision. In any event, there was an arbitration ruling on October 15, 2001 giving Commercial Union the right to interpose defenses.

As of this time, the arbitrators had before them Commercial Union's claims for rescission, and also the issue of Commercial Union's reinsurance liability for asbestos claims, which was the subject of the original arbitration demand in 1993. The arbitrators did not yet have before them the matter of environmental claims.

On October 31, 2001, the arbitrators made their rulings in Phase I of the arbitration. The three arbitrators were unanimous in finding that EMLICO had deceived the Massachusetts Insurance Commissioner and the Bermuda authorities about its solvency. The unanimous ruling was further to the effect that EMLICO had moved to Bermuda to avoid being liquidated in Massachusetts, and that EMLICO intended to declare insolvency immediately after redomestication. However, the arbitrators stated that "because this arbitration Panel is the final adjudicator, the Panel finds that CU is no worse off in Bermuda than in Massachusetts." By a majority vote, the arbitrators ruled that Commercial Union's request to rescind its reinsurance policies with EMLICO was denied. The arbitrators made a number of statements indicating that they would exercise great care in making sure that the issues before them were fairly decided. Among other things, looking toward Phase III (dealing with

environmental claims), the Panel stated that it would carefully scrutinize whether any settlement between General Electric and the Joint Liquidators was "arms-length both as to substance and appearance."

On January 26, 2002, the arbitrators issued a Clarification of the Phase I order. Although a majority of the arbitrators did not see fit to relieve Commercial Union of its reinsurance liability in toto, the arbitrators made clear that their objective was to remedy whatever adverse effects may have occurred from the deceitful change of jurisdiction from Massachusetts to Bermuda.

What was needed at this point was to complete the arbitration regarding asbestos claims, which had been commenced in 1993. Two issues in this arbitration have now received a great deal of attention in the current hearing in the District Court. One relates to the meaning of "occurrence" in the EMLICO policies issued to General Electric, and the other relates to an endorsement in the 1991 policy, known as Endorsement 29. It will be recalled that, going back some years, EMLICO had treated asbestos claims the way it treated workmen's compensation claims. Each claim of an individual was treated as a separate occurrence, and a single policy year was used as the time of the occurrence. This meant that General Electric was receiving no insurance on asbestos claims. This system was revised in 1992, after General Electric requested a change in treatment, and EMLICO had received legal advice on the subject. As mentioned earlier, the Asbestos Claims Handling Agreement was entered into,

providing that claims from a product type could be grouped into a single occurrence, and there was a change in the time period over which the occurrence could be spread. But the important change was the grouping. On the basis of the ACHA, EMLICO had settled many asbestos claims with General Electric, and by the time of the redomestication about \$138 million had been paid to General Electric.

Reinsurers other than Commercial Union took the position that they wanted the ACHA to be applied. However, in its arbitration, Commercial Union objected to the ACHA and in its initial briefing took the position that a single occurrence per policy year was supported by case law. This meant some degree of grouping, in contrast to the earlier practice of having each claim treated as a separate occurrence. At some point in the arbitration, Commercial Union changed its position from espousing the single occurrence per policy year to advocating that each claim be treated as an occurrence. The Joint Liquidators, in the arbitration, agreed with Commercial Union that the ACHA should not apply and further agreed with Commercial Union's initial briefing that there should be a single occurrence per policy year.

As to Endorsement 29, it was contained in the 1991 policy. Identical language was contained in other policies, although the discussion was focused on Endorsement 29 in the 1991 policy. The language is as follows:

Not withstanding any other terms or conditions of this policy or any other policy issued by Electric Mutual Liability Insurance Company

or ELM Insurance Company as respects limits of liability, it is hereby understood and agreed that in connection with a series of and/or severe losses, injuries, damages or liabilities which are attributed directly or indirectly to the same event, condition, cause, defect or hazard or alleged defect or hazard; the maximum combined limit of liability of Electric Mutual Liability Insurance Company and ELM Insurance Company under all policies issued to General Electric Company shall in no case exceed $25,000,000 as respects all personal injuries and/or property damage and/or loss of use of property.

The issue is whether the Endorsement 29 language was to be applied in its literal form to limit EMLICO's liability on asbestos claims to $25 million on all policies ever issued by EMLICO to General Electric. EMLICO, after having legal research carried out, determined that Endorsement 29 could not be applied to asbestos. On this basis, EMLICO had made its settlements with General Electric for its asbestos cases amounting to about $138 million. In 1999, for the first time in the arbitration, Commercial Union advanced the argument that the Endorsement 29 language applied to all EMLICO policies and provided an absolute limit to EMLICO's liability for asbestos claims in the amount of $25 million. The Joint Liquidators obtained legal advice to the contrary. In the arbitration, the Joint Liquidators took the position that Endorsement 29 did not apply to limit EMLICO's total liability to $25 million.

There was extensive testimony and briefing before the arbitrators about the meaning of occurrence and about Endorsement 29 prior to the arbitrators making their decision.

The arbitrators made their award regarding asbestos in Phase II of the

arbitration on June 19, 2003. It should be noted that the Phase II arbitration had been unusually lengthy, with a very large amount of evidence. The arbitrators had taken the extraordinary step of holding the arbitration in several locations so that the desired witnesses could be subpoenaed.

In the Phase II award, since Commercial Union had persisted in its argument that its reinsurance contracts with EMLICO should be rescinded, the arbitrators once again ruled that the demand for rescission should be denied. As to the issue about occurrence, the arbitrators ruled that Commercial Union was bound to reimburse EMLICO on the basis of a single occurrence per policy year. The arbitrators further ruled that Endorsement 29 applied only to 1991. The above rulings were by a majority of the Panel.

The Panel unanimously ruled that Commercial Union should pay EMLICO $36,364,719.92, which represented Commercial Union's unpaid share of paid asbestos losses. Commercial Union was also to pay $5 million in interest. EMLICO's request for attorney's fees, and costs and expenses, was denied.

Phase III of the arbitration, dealing with environmental cleanup claims, has not really progressed to a substantial extent. There has been considerable maneuvering to determine what liability EMLICO has to General Electric, and, strictly speaking, issues between EMLICO and General Electric are not subject to arbitration. As described above, Commercial Union obtained an agreed-to

arbitration ruling on October 15, 2001 allowing Commercial Union to interpose EMLICO's defenses. On November 26, 2004, Commercial Union went to Bermuda to have the Bermuda court enforce this ruling. This was significant for two reasons. First, it signified that Commercial Union wished to terminate any participation in the Warner settlement process. Second, Commercial Union was turning to litigation, and wished to interpose EMLICO's defenses. In the lower court in Bermuda, the Joint Liquidators opposed the application in an attempt to salvage the settlement process. The Joint Liquidators won in the lower court on July 8, 2005. However, the appellate court reversed on March 17, 2006, stating that the Bermuda courts should have further proceedings to determine the extent of Commercial Union's right to interpose defenses. This was followed by correspondence between the Joint Liquidators addressed to Commercial Union and General Electric, about the possibility of having the litigation of the issues between EMLICO and General Electric go forward in the Massachusetts courts. The Joint Liquidators then moved in the Bermuda court seeking to litigate the General Electric claims (these would be the environmental cleanup claims) in Massachusetts. On January 15, 2007 the Bermuda court approved this application. The Joint Liquidators have explained that the reason for the move to Massachusetts was to comply with the repeated assertions by Commercial Union in various forms that

Commercial Union wished to have the litigation of the environmental cleanup issues between EMLICO and General Electric take place in Massachusetts.

At about this time General Electric filed an action in Massachusetts seeking a declaratory judgment regarding its insurance claims against EMLICO as to environmental cleanup. Based on its right to interpose defenses, Commercial Union filed an answer, denying liability on the part of EMLICO, asserting numerous affirmative defenses and three counterclaims. The Joint Liquidators filed a motion to dismiss the counterclaims which was denied.

Thereafter, the position of the Joint Liquidators was, and still is, that the Massachusetts litigation will be solely between Commercial Union and General Electric.

## Discussion

It is now necessary to deal with the questions posed by the Second Circuit Court of Appeals on remand. The original action in the Federal District Court was brought by Commercial Union, seeking to vacate the Phase I arbitration award to the extent that it denied rescission of Commercial Union's reinsurance contracts with EMLICO. The Phase II award had not yet been made. Commercial Union sought in the District Court to enjoin any further arbitration in connection with asbestos and environmental cleanup issues. The Joint Liquidators applied in the District Court to confirm the Phase I award, and opposed injunctive relief directing against further arbitration. The

District Court confirmed the Phase I award and denied injunctive relief. 239 F.

Supp 2d 351. Commercial Union appealed. By the time of the appeal, the

Phase II award had been rendered.

The Court of Appeals vacated the District Court's order and remanded for

further proceedings. There are three passages in the Court of Appeals opinion

which describe the essential nature of the remand. The Court stated:

> Thus, we believe that it might be improper for this court to affirm
> (and thus, in effect, enforce) an arbitration award if, in fact,
> Commercial Union was prejudiced by EMLICO's deceitful
> redomestication. 378 F.3d at 208.

The Court further stated:

> Moreover, the district court, in reviewing the validity of the arbitral
> award in Phase I, did not consider whether liquidation in Bermuda
> could affect the results of the arbitration." Id. at 209.

Finally, the court directed:

> Under these circumstances, we believe the correct approach on this
> appeal is to vacate the district court's order of December 18, 2002,
> and send the case back to the court for reconsideration of the Phase
> I award (with the result in Phase II before it). . . . But we caution the
> district court that it must address whether liquidation in Bermuda –
> which flowed from redomestication in Bermuda – could affect the
> results of the arbitration, and whether confirming the arbitral awards
> in Phases I and II would violate the court's equitable principles. Id.

Some interpretation of the remand is necessary. The first passage

quoted above raises the question of whether Commercial Union was prejudiced

by the deceitful redomestication. The second passage phrases the issue as

being whether liquidation in Bermuda could affect the results of the

arbitration. The third passage is similar in stating that the District Court must address whether liquidation in Bermuda, which flowed from the redomestication, could affect the results of the arbitration.

Obviously, the redomestication resulted in a change of venue. Insolvency proceedings would have occurred in Massachusetts, and the Massachusetts Commissioner of Insurance would have been appointed as Receiver. This Receiver would have been confronted with the same issues of insurance coverage presented to the Joint Liquidators in Bermuda. But could this difference in venue have affected the results of the arbitration, which had been commenced two years earlier in 1993? In a simplistic sense, Yes. For many reasons, different officials, court officers, etc., can act differently and produce different results, in arbitrations as in everything else.[1] But surely the Court of Appeals was not intending to be simplistic. Regardless of the precise phraseology, it is evident that the Court of Appeals desired a determination of whether Commercial Union was prejudiced by the redomestication. That is, was there some prejudice to Commercial Union that affected or could have affected the results of the arbitration? Of course, "prejudice" has a well-defined meaning in the law. It does not simply mean losing. It refers to some disadvantage or difficulty resulting from deficiency, impropriety, or violation of

---

[1] Commercial Union has presented arguments about specific steps which the Massachusetts Commissioner, as Receiver, would have taken had there been no redomestication. These arguments will be dealt with later in the opinion.

law. For example, in criminal cases the question can occur as to whether a defendant was prejudiced by inadequate counsel.

If then the issue is prejudice, what is the precise issue about prejudice in the present case? This issue necessarily relates to the performance of the Joint Liquidators. No question has been raised about the arbitrators. They were the same after the redomestication as before. The essential change resulting from the redomestication is that the Joint Liquidators took over EMLICO's position rather than the Massachusetts Insurance Commissioner.

There appears to be no complaint about the role the Joint Liquidators played in the Phase I arbitration. Indeed, there has been no real comment on what they did or did not do at this stage. Commercial Union was making its claim to the arbitrators that the redomestication was the result of wrongdoing by EMLICO, and that this entitled Commercial Union to rescind its reinsurance contracts with EMLICO. The arbitrators unanimously found that the redomestication involved deceit by EMLICO, but a majority of the arbitrators concluded that Commercial Union was asking too great a remedy and denied its request for rescission. There has been no claim of impropriety on the part of the Joint Liquidators in the Phase I arbitration, and no suggestion that the Joint Liquidators did anything to prejudice Commercial Union in this phase of the proceedings.

Commercial Union's real claim of prejudice relates to the Phase II arbitration dealing with asbestos. Commercial Union's allegations actually deal with events starting before the arbitration even started. Commercial Union contends that there was collusion between General Electric and EMLICO, resulting in changes in the way EMLICO dealt with coverage issues. Commercial Union alleges that, without this collusion, EMLICO would have continued to apply the policies in such a way as to preclude <u>insurance payments</u> to General Electric on asbestos claims and to <u>wholly deny coverage</u> regarding environmental cleanup claims. According to Commercial Union, the Asbestos Claims Handling Agreement of 1992 was the product of collusion, as was the commencement of a process of settling the environmental cleanup claims. Commercial Union contends that the ultimate goal of all this was to reach the reinsurers. Commercial Union argues that the redomestication was the further product of the collusion between EMLICO and General Electric and that, again, the real purpose was to extract money from reinsurers.

In response to these arguments, the first thing to be said is that the District Court has no authority, under the remand or under any rule of law, to make rulings or grant remedies with regard to allegations of wrongdoing which are said to have occurred before the arbitration began and before the redomestication occurred. Such claims were for the arbitration. In a statement dated November 20, 2002, the arbitrators specifically stated that

Commercial Union could argue collusion in connection with the Phase II arbitration. The allegations of collusion just described are relevant to the present remand only as possible circumstantial evidence of improper prejudicial conduct in the arbitration.

However, it is only fair to say that General Electric's efforts to obtain revisions to its insurance treatment by EMLICO raised legitimate issues about insurance coverage. These legitimate issues needed to be resolved, and, insofar as they related to asbestos, they were properly the subject of the second phase of the arbitration. As far as the issues related to environmental cleanup, they are the subject of the court case now pending in Massachusetts, and may be the subject of Phase III of the arbitration.

It is now necessary to rule on the central issue, which deals with the conduct of the Joint Liquidators in the Phase II arbitration. It is surely true that EMLICO had a fiduciary duty to its reinsurers, but it also had a fiduciary duty to its insured, General Electric. The Joint Liquidators assumed these fiduciary duties. This meant, as both sides in this case agree, that the Joint Liquidators were "in the middle" between General Electric and Commercial Union. This meant that they could not automatically follow the positions taken by Commercial Union any more than they could automatically follow the positions that favored General Electric. The Joint Liquidators were duty-bound to consider the interests of General Electric and Commercial Union, and to

consider the factual or legal positions urged by both of these parties. After this, the Joint Liquidators were obligated to take their stand both on the evidence and the law, in accordance with what they believed to be best supported.

As indicated earlier in the opinion, the court is convinced beyond any possible doubt that these three Joint Liquidators were persons of the highest integrity and expertise. Despite what might have been loosely talked about in the "redomestication documents", the court finds on the basis of the credible evidence presented to it, that General Electric never had an intention to control the Joint Liquidators and was fully aware that this would not be possible. Moreover, after the Joint Liquidators took office, General Electric did not seek to control them in any degree, nor did the Joint Liquidators ever allow themselves to be so controlled.

Earlier in the opinion, the Court described the details of how the Joint Liquidators handled the issues in the Phase II arbitration, which had become the subject of controversy. The Court simply states now that the positions which the Joint Liquidators took on these issues were arrived at after a thoroughly conscientious analysis and were well grounded in fact and law. As earlier described, the arbitration was remarkably lengthy and thorough, and the Joint Liquidators' participation has not been shown to be anything but according to the highest standard.

Therefore, there is no basis for finding that the Joint Liquidators were deficient or engaged in misconduct of any kind, or that their actions resulted in prejudice to Commercial Union, within the accepted meaning of that word.

Commercial Union argues, in effect, that what has just been said is not a sufficient answer to the questions posed by the Court of Appeals on remand. Commercial Union contends that the redomestication did indeed affect the results of the arbitration as shown by the following. Commercial Union called as a witness a former Massachusetts Insurance Commissioner (not the one actually in office at the relevant time), who testified that, in her opinion, a Massachusetts Commissioner, as Receiver, would have acted differently from the way the Joint Liquidators performed. Although her testimony is not entirely clear, it is probably fair to say that she expressed backing for the coverage positions Commercial Union urges and indicated that a reasonable commissioner would have made a blanket denial of General Electric's claims and forced a litigation. She gave no testimony about any possible attempt to settle.

The Court does not find this testimony persuasive. It is impossible to say that the actual Massachusetts Insurance Commissioner in office would have done anything substantially different from what was done by the Joint Liquidators, or if different steps or positions had been taken, whether they would have been helpful or hurtful to Commercial Union and the other

reinsurers who would have been involved at the time of a Massachusetts insolvency proceeding. The latter point is essential. At the time of any Massachusetts insolvency (probably 1995), there were numerous reinsurers with exposures of billions of dollars. The Joint Liquidators settled with all these reinsurers except Commercial Union and two other small reinsurers, and thus brought hundreds of millions of dollars into the EMLICO estate. There is surely considerable doubt as to whether an unyielding adversarial position, such as now advocated by Commercial Union, would have been as beneficial to the EMLICO estate, and to reinsurers, as what was produced by the efforts of the Joint Liquidators. As to specific positions on specific issues, a Massachusetts Receiver, like the Joint Liquidators, would have had duties to both the reinsurers and to the creditor, General Electric. This Receiver would have been duty-bound to do what the Joint Liquidators did, which was to consider how best to apply the law to the issues. A Massachusetts Receiver would have also been obliged to reckon with the fact that EMLICO had already made more than $138 million in payments to General Electric for asbestos, and had participated in a non-binding arbitration on environmental cleanup, resulting in a tentative, but surely weighty, opinion from the arbitrators against the validity of EMLICO's position denying coverage.

For these reasons, it cannot be said that the redomestication deprived Commercial Union of any substantial advantages which it would have gained in

Massachusetts. Of course, the further obvious fact is that Commercial Union is now able to raise all of the issues which is wishes to raise, regarding environmental cleanup, in the Massachusetts court, which is the scene of a direct litigation between Commercial Union and General Electric.

The final question is whether confirming the arbitral awards in Phases I and II would violate the Court's equitable principles. The answer lies largely in the fact that the arbitrators in their Phase I and Phase II awards found, and took full account of, the deceit. But it must be remembered that the deceit was not fraudulent claims or corruption of the liquidators. The arbitrators obviously recognized that the deceit, which involved concealment of EMLICO's imminent insolvency, did not really change the nature of Commercial Union's obligations under the reinsurance contracts. Thus, the arbitrators did not permit Commercial Union to transform the deceit into an enormous benefit to Commercial Union in the form of relieving it of all of its reinsurance obligations to EMLICO.

At the same time, the arbitrators did not decline to take the deceit into account in what they considered an appropriate measure. The Clarification issued by the arbitrators as to the Phase I award stated that, in connection with the further arbitration proceedings, the Panel would be in a position to "adjust for any differences that may have resulted from the deceitfully obtained change of jurisdiction from Massachusetts to Bermuda." One thing that did happen is

that, in response to the request of the Joint Liquidators in Phase II for interest of $15.6 million, the arbitrators awarded only $5 million.

The court concludes that, under the circumstances presented by the present case, it would not be a violation of the Court's equitable principles to enforce the Phase I and Phase II arbitration awards and to permit Phase III of the arbitration to go forward when and if that is necessary. The Court believes that the arbitrators dealt with the issue of deceit in a wise and equitable manner. The Court further believes that it would be highly inequitable to vacate the awards and grant injunctive relief barring further arbitration. To do so would confer a huge and undeserved benefit on Commercial Union.

In both Phase I and Phase II, the arbitrators resolved the issues in a thoroughly reasonable and sound manner. These awards are entitled to the deference customarily accorded to arbitration rulings under the law.

## Conclusion

The Court now makes its ruling pursuant to the Court of Appeals remand in O2 Civ. 0573. This respects Judge Berman's order denying the motion of Commercial Union to partially vacate the Phase I award, denying the motion to enjoin further arbitration, and granting the Joint Liquidators' motion to confirm the Phase I arbitration award. The court now rules that this order, vacated by the Court of Appeals pending remand, is adopted in all respects.

With respect to 03 Civ. 7376, the motion by petitioner OneBeacon,

formerly Commercial Union, to vacate the Phase II arbitration award is denied,

and the Phase II award is confirmed. The petition in that action is dismissed.

The parties should settle appropriate orders or judgments.

Dated: New York, New York
       May 30, 2008

                            Thomas P. Griesa
                            U.S.D.J.